## 38043. RHODES *v.* LIBERTY MUTUAL INSURANCE COMPANY *et al.*

DECIDED MAY 2, 1960—
REHEARING DENIED MAY 12, 1960.

*Robert Carpenter, A. Tate Conyers,* for plaintiff in error.
*Henry A. Stewart, Sr.,* contra.

BELL, Judge. ■ The evidence discloses that during the course of his employment at Aragon Mills, Rockmart, Georgia, on the evening of March 4, 1958, the claimant lifted a roll of cloth weighing between 75 and 100 pounds. At about 10 p.m., which was 30 or 40 minutes after he lifted this roll, the claimant suffered a severe chest pain which affected his breathing and which continued at the same intensity until the end of the shift at midnight. The next day he suffered the same pain, but went ahead to serve on the grand jury at Cedartown. During the day the pains got worse, and soon after he returned home in the afternoon, he entered the hospital. Shortly thereafter his wife called the personnel office at the mill and notified the management that the claimant had gotten sick while in Cedartown that day and would not be in for work. The claimant remained in the hospital for 18 days and received full payment until May 9, 1958, when he was discharged from employment, purportedly as the result of a general cut-back in the labor force.

The defendants first contend that proper notice of the accident was not given by the employee since they were not informed of the incident occurring on the evening of March 4, but only that the claimant had suffered an attack while on grand jury duty the next day. However, the claimant's own testimony, though disputed, authorizes the finding that while he was in the hospital he told J. S. Edmonds, his immediate superior, that he suffered this pain in his chest on March 4, while on the job. This constitutes sufficient notice under the provisions of Code § 114-303 and this contention of the defendants is without merit. *Ocean Accident &c. Corp.* v. *Martin,* 35 *Ga. App.* 504 (2) (134 S. E. 174).

■ Under Code § 114-710 and a legion of cases decided by this

court, the findings of fact made by members of the State Board of Workmen's Compensation shall, in the absence of fraud, be conclusive. This Code section and the cases provide, however, that the court shall set aside the order if it be found that there is no sufficient competent evidence in the record to warrant the members in making the order or decree complained of. It is further provided in the Code section that no order or decree of the board shall be set aside by the court upon any grounds other than those stated therein.

The intent of the legislature is clearly stated, and this intent is amply reinforced by judicial decisions, to the effect that the orders or decrees of the board should not be reversed and set aside except for one or more of those reasons declared in the statute. It is contended here that there is not sufficient evidence to support the award of compensation, but it seems that the record and findings of fact of the board distinctly show that there is sufficient, competent evidence in the record to warrant the members in making the instant order or decree, and therefore the decree of the board should have been upheld by the trial court.

The testimony in the record discloses in part the following: "Q . How long were you in the hospital, Mr. Rhodes? A. Eighteen days. Q. And have you been able at all to go back to work since the date of your sickness? A. I have not. Q. Did you attempt to go back just sit around or see if you could do anything at a date subsequent to your first pain? A. Well, yes. Q. Why did you go back there? A. Well, the officer came to my house. Q. He came to your house? A. He came to my house on Saturday on April 26 and to see me and in the course of the conversation he asked if I wouldn't like to go back and work a few hours a day until I could get my strength back. The Director: Who was that? The Witness: The overseer of my department, my overseer his name was S. J. Edmonds. A. And I told him, well I thought it would be all right. I didn't know I would have to consult my doctor and my son was taking me there then and waiting to carry me to the doctor and the doctor hasn't permitted me to drive at that time so when I asked Doctor [S] about it he said not over an hour a day and

says, 'Don't get fatigued at all.' Q. Tired? A. That's right. Q. All right, go ahead. A. So, on Sunday morning at church I told Mr. Edmonds what he said, and he said, 'Oh, I will have to clear that with the office, I will let you know.' Well, the next week I says, 'Now, I can't go the next [?] coming.' So, the next week I didn't hear anything out of them and it's on Friday, why, I hadn't even been to the mill at all and on Friday I went back to the doctor and he told me it would be alright if I could go in there and stay an hour and not over two hours. So I went down and told what he said and says you come in Monday morning. He said come in about twelve o'clock and then I can go to lunch. Q. Were you to do the same type of work that you had been doing, Mr. Rhodes? A. Oh no, he stressed the point that I wasn't to do anything, I wasn't even to as much as pick up a small rag off the floor. Q. Not to even do any manual labor at all? A. No he stressed the point and I was only to help them supervise."

The record displays the testimony of Dr. [S] as follows: "Q. Doctor [S], have you or have you not recommended for Mr. Rhodes to go back to work at the job as supervisor? A. Yes, I recommended after his symptoms disappeared as this has been some time ago that I thought a slow break-in was in order that I saw no reason for him not to work. Q. But, did that apply to his job as supervisor at the mill at which he was working at the time he had this attack or was that with reference with some other type of work? The Director: You recommended light work there, Doctor, or the same employment? The Witness: Yes, sir, I recommended a two hour with an increase every day until he got used to working. Q. Would Mr. Rhodes be able to retire to a type of job where he was under strenuous pressure? A. Let me answer your question this way, if I may, I told Mr. Rhodes to voluntarily increase his working day, now the main thing, the important thing is not to become engaged in pressure or the feeling that of being [?] or that he needed to be here and that he [?] needed there and I told him not to let that enter into it at all."

In the findings of fact by the deputy director, which findings of fact were adopted subsequently by the majority of the board

on appeal, it is stated: "The medical testimony in this case, as in all heart cases, is in conflict. Dr. [S] who has treated the claimant from the onset of his attack testified at the hearing that the anxiety and pressure under which the claimant was working as well as the weight he lifted would be sufficient to precipitate a heart attack."

Although this finding of fact quoted above was in connection with whether the heart attack was in the course of employment, yet it indicates the type of work the claimant ordinarily did and is relevant as to his disability. The findings of fact further state that Dr. [C], although disputing the cause of the injury, did testify that by taking drugs to alleviate the angina pains, the man could return to his employment with strict limitations as to the magnitude of his exertions.

The findings of fact further continue: "Now I have the highest regard to [?] Dr. [C] as a heart specialist, however, it is the duty of the board to try to rationalize the Code analyzing medical [?] diagnosis into terms of workability as compared with a man's work record prior to his injury and his ability to work after an injury and there are no medical charts available that can evaluate the feeling of a man who has had a heart attack nor can it be determined [?] the employer's feeling who is willing to rehire a man who has had a heart attack. I therefore find as a matter of fact that even in view of a conflict in medical testimony it is quite obvious in the instant case that the claimant has carried the burden of proof necessary to show that he had a heart attack by whatever name it is called, which occurred in and out of the course of his employment and that the employee has been definitely disabled since the date of that accidental injury, namely, March 4, 1958, with the exception of some minor efforts to return to his work and did work one or two hours a day."

An analysis of the quoted testimony and findings of fact clearly requires the conclusion that the testimony in the record justifies the findings of fact by the board, that such findings by the board are warranted, and its decree is properly supported. See *U. S. Fidelity &c. Co.* v. *Brazier*, 96 *Ga. App.* 743 (101 S.E. 2d 625).

The finding of the board that the claimant had suffered temporary total disability and the award of compensation based thereon are supported by competent evidence. The superior court erred in reversing and setting aside the award.

*Judgment reversed. Gardner, P. J., Townsend, Carlisle, Nichols and Frankum, JJ., concur. Felton, C. J., dissents.*

FELTON, Chief Judge, dissenting. In my opinion, the finding of the board that claimant had suffered "temporary total disability" and the award of compensation based thereon are not supported by any evidence. In regard to the nature of the claimant's heart condition, the doctor who treated him in the hospital and afterwards testified that on the first examination the claimant suffered from pallor and cold perspiration, weak pulse, respiration rate of approximately 30 and chest pain; that it was felt mandatory to carry him along as a possible coronary thrombosis; that he was given treatment of a patient suffering from a coronary, mainly sedatives, bed rest and blood pressure stabilizers; that he improved under this treatment; that after the claimant's symptoms had disappeared for some time there was no reason for him not to work and he recommended a two-hour day with an increase every day until claimant got used to working but that the important thing was not to get himself under pressure. On cross-examination this doctor testified that an electrocardiogram did not reveal any permanent heart damage, that the claimant had suffered from cardiac ischemia, a temporary non-function of a blood vessel in the heart which, if not controlled, could develop into coronary thrombosis.

Doctor Robert P. Coggins was appointed to make an impartial examination of the claimant's heart condition and in his opinion, he does have some angina pectoris but by taking drugs to alleviate the angina pains the man could return to his employment with strict limitations as to the magnitude of his exertion.

The claimant's own testimony shows that he was able to return to work in a supervisory capacity for several days and drew pay for one week ending May 9, 1958.

Considering the medical testimony and that of the claimant as a whole, there is no basis in the evidence for the finding of

"temporary total disability." Where the injured employee is able to resume his former occupation or to procure remunerative employment at a different occupation suitable to his impaired capacity, he can not be classified as totally disabled. *Employers Liability &c. Corp.* v. *Hollifield*, 93 *Ga. App.* 51, 53 (90 S.E. 2d 681) and cases cited. The uncontradicted evidence shows that the claimant has been physically able since before his discharge from work to engage in some remunerative employment suitable to his impaired capacity. Under these circumstances the award based upon "temporary total disability" should not be allowed to stand and, in my opinion, the superior court did not err in setting it aside.